UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSEPH N. MALOUF, III,

    Plaintiff,

v.                                              Case No. 10-cv-14763
                                              Paul D. Borman
                                              United States District Judge

THE DETROIT MEDICAL CENTER d/b/a/        R. Steven Whalen
SINAI-GRACE HOSPITAL, and                  United States Magistrate Judge
CATHY DOCKERY

    Defendants.

_____/

**OPINION AND ORDER**
**(1) ADOPTING THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**
**(Dkt. No. 82);**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. No. 64),**
**and**
<u>**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Dkt. No. 71)**</u>

      This is an employment discrimination case arising under Title VII of the Civil Rights Act of 1964. Before the Court are cross motions for summary judgment. Defendants Detroit Medical Center ("DMC") and Cathy Dockery (collectively "Defendants") filed a Motion for Summary Judgment on August 22, 2011. (Dkt. No. 64.) Plaintiff Joseph Malouf ("Plaintiff") filed a Motion for Summary Judgement and a separate Response to Defendants' Motion on September 12, 2011. (Dkt. Nos. 71, 72.) Defendants filed a Response to Plaintiff's Motion on October 6, 2011. (Dkt. No. 79.)

      The Court referred the above motions to Magistrate Judge R. Steven Whalen, who filed a

1

Report and Recommendation ("R&R") to grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment on August 7, 2012. (Dkt. No. 82.) Plaintiff filed Objections to the R&R on August 21, 2012. (Dkt. No. 83.) Defendants filed a Response to Plaintiff's Objections on August 30, 2012. (Dkt. No. 84.)

For the reasons stated below, the Court will:

(1) ADOPT the Magistrate Judge's Report and Recommendation;

(2) GRANT Defendants' Motion for Summary Judgment; and

(3) DENY Plaintiff's Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff began working for Defendant DMC on April 6, 2007, as an emergency room paramedic. (Compl. ¶ 5.) On September 25, 2009, Plaintiff was discharged. (Compl. ¶¶ 32-34.)

Plaintiff alleges that his September 2009 termination was retaliation for "sexual harassment" complaints he filed in May and July of 2008. (Compl. ¶ 39.) Plaintiff's May 2008 "complaint" consists of an email sent to DMC Human Resources employee Joi Little. (Pl.'s Mot. Summ. J. at 4, Ex. 22, May 30, 2008 Email.) Plaintiff's email states:

> I respectfully request to be transferred to day shift effective immediately for reasons that include: contradictions in orders given by management, both active and passive harassment, unfair work practices, I've been refused access to human resources to appeal a disciplinary action, I've been denied lunch breaks while working 12 hour shifts and I have been witness to HIPPA [sic] violations.

(May 30, 2008 Email at 1.)

Plaintiff's May 2008 complaint contains numerous grievances regarding Plaintiff's manager, Barb Evans, and her allegedly unfair treatment of Plaintiff. But Plaintiff does not link any of the allegedly unfair treatment contained in the May 2008 Email to his gender. Indeed, Plaintiff notes

2

that some men receive favorable treatment from Ms. Evans, including an incident on January 11, 2008, where Plaintiff "was forced to work walk-in triage (the busier assignment) . . . while Ron and Mike did very little." (May 30, 2008 email at 1.)

Nevertheless, Plaintiff states that he "filed a formal sexual harassment complaint with human resources" on June 13, 2008. (Pl.'s Mot. Summ. J. at 6.) Plaintiff's June 13, 2008 "complaint," like his May 2008 "complaint," is an email written to Joi Little in the DMC Human Resources department. (Pl.'s Mot. Summ. J., Ex. 6, Jun. 13, 2008 Email.)

In the June 13, 2008 Email, Plaintiff alleges that his manager, Ms. Evans, engaged in harassing behavior towards Plaintiff. Plaintiff states: "I have now come to suspect that I have been retaliated against for discontinuing a relationship with [Barb Evans'] subordinate Charge Nurse Ms. Farao." (Jun. 13, 2008 email at 1.) However, Plaintiff does not allege that he was treated differently because he is male. Instead, Plaintiff claims that Evans' "harassment" was based on her personal dislike of Plaintiff, based on his treatment of Farao.

> I believe that Ms. Farao confided in her close friend, Ms. Evans, about the failed relationship and I believe it is no coincident [sic] that my termination of this relationship was immediately followed by sanctions by Ms. Evans; otherwise referred to as "Barb's wrath" by [Emergency Department ("ED")] staff. I was first introduced to this term by ED staff at the beginning of my employment. I was told that if Ms. Evans is not pleased with one of her employees she does not follow official corporate guidelines of discipline, nor is she willing to discuss it like an adult, but that she "finds a ways [sic] to make your life hell" as it had been explained to me.
> . . . . I rejected a continued sexual relationship and harassment followed. Granted the rejection was directed to party A (Ms. Farao) but the harassment following rejection came from party B (Ms. Evans).

(Jun. 13, 2008 Email at 2.) The Court notes that neither Barb Evans nor Ms. Farao are parties to the instant lawsuit.

3

Plaintiff's June 13, 2008 Email "complaint" sought, *inter alia*, that he be "moved to day shift effective immediately[,]" and that the move "not affect [his] pay." (Jun. 13, 2008 Email at 6.)

In July 2008, Plaintiff contacted the EEOC via email and relayed his complaints regarding Ms. Evans' alleged harassment. Plaintiff also stated that "Ms. Farao is clearly attempting to get me fired or upset me enough to get me to quite because I refused to have sex with her anymore." (Pl.'s Mot. Summ. J., Ex. 8, July 23, 2008 Email at 2.)

Plaintiff's alleged harassment by Ms. Evans and Ms. Farao was adequately summarized by the Magistrate Judge in the R&R as follows:

> Plaintiff claims that in August, 2007, a supervising female nurse, Maria Farao . . . approached him, proposing a sexual relationship to which he consented. [Compl. ¶ 7.] The Complaint alleges that he ended the relationship "about" December, 2007. *Id*. at ¶ 8. Plaintiff testified that he spent Christmas of 2007 with Farao, but broke up with her "not too long after that." *Malouf Dep, Defendant's* [sic] *Exhibit F,* pg. 54.
>
> Plaintiff claims that shortly after ending the relationship, Farao routinely assigned him a work load customarily performed by two or three paramedics. [Compl. ¶ 9.] On January 21, 2008, his shift manager Barb Evans . . . brought a disciplinary action against him and contrary to DMC policy, prohibited him from appealing her decision. *Id*. at ¶ 10. He claims further that in the following month, Evans denied him lunch breaks although he was working 12-hour shifts. *Id*. at ¶ 11. He acknowledges that he received an "expert" job rating from Evans in April, 2008, but alleges that later the same month, he was forbidden by Evans from using a men's restroom adjacent to his work area. *Id*. at ¶¶ 13-14. However, Plaintiff conceded at his deposition that the order could have been issued because he had taken a break prior to the end of his shift. *Malouf Dep., Defendants' Exhibit F*, pg. 31.
>
> On May 30, 2008, Plaintiff filed a "sexual harassment" complaint against Evans with the hospital's human resources department ("human resources") on the basis that Evans had been retaliating against him for ending the relationship with Farao. *Complaint* at ¶ 15. He attributes the fact that he was not subsequently forbidden to use the same men's room to a complaint he sent to human resources following the incident. *Malouf Dep., Defendants'*

4

>*Exhibit F*, pg. 33.
>
>He alleges that shortly after, he was written up for "examining the genitals" of an individual Plaintiff believed had been shot in the groin. [Compl. ¶ 16.] Defendants concur that seven days following Plaintiff's complaint to human resources, he received a written warning on June 6, 2008 for examining the genitals of a gunshot victim in a public area of the emergency department rather than in a private room. *Defendant's* [sic] *Brief* at 4; *Exhibits A, G*. Plaintiff alleges that as of June 8, 2008, his job duties were changed from "being the triage paramedic to changing adult diapers, feeding patients and drawing routine blood work in the treatment area of the [emergency department]." *Complaint* at ¶ 20. He alleges that while he was looking for a wheelchair for a patient in a hallway adjacent to the emergency department, Evans ordered him to leave the hallway. *Complaint* at ¶ 22. Although the *Complaint* alleges that Plaintiff filed an EEOC action on July 23, 2008 for sexual harassment, he conceded at his deposition that he sent an email to the EEOC but did not follow through with charges at that time, noting that following a June to August, 2008, medical leave, his request to move to the day shift was granted. *Malouf Dep., Defendants' Exhibit F*, pg. 40.

(R&R at 2-3.)

After Plaintiff's complaints in May, June, and July of 2008, his request to be reassigned to the day shift was granted, and he began working a day shift in August 2008. (Pl.'s Mot. Summ. J. at 7.) Plaintiff testified that he did not pursue his sexual harassment claims after he was moved to the day shift:

> Q    Now, am I correct you did not file any similar notarized charge of discrimination in 2008? Is that correct?
>
> A    That's correct, because I was moved to day shift, as I requested, and my promise to HR was if they would please just move me away from the command of someone I felt was retaliating against me for ending a sexual relationship, that I would not pursue the formal EEOC complaint, because that was the only thing I wanted, was just to do my job in peace and not be harassed by Barb, and indeed I was moved to days and I kept my word that I would not pursue a formal complaint.

(Defs.' Mot. Summ. J., Ex. F, Jun. 25, 2011 Malouf Dep. 39-40.)

5

Plaintiff does not allege any further "retaliatory" actions until spring 2009. The Magistrate Judge summarized these claims as follows: "Plaintiff also alleges that in spring of 2009, supervisor Stephany Gaston attempted to have him terminated for patient endangerment, insubordination, and malingering, but all three claims were denied as meritless by DMC's human resources department. *Complaint* at ¶¶ 28-30." (R&R at 3-4.) Stephany Gaston is not a named party in this case. However, Plaintiff alleges that she acted "under the command of the Defendant [DMC Vice President of Patient Services Cathy Dockery]." (Compl. ¶¶ 28-30.)

In September 2009, Plaintiff began selling shirts to DMC staff members using a design that he had created, but that was not approved by DMC management. (Defs.' Mot. Summ. J., Ex. A, Dockery Decl. ¶ 11.) Defendant Dockery requested that Plaintiff stop soliciting orders for his shirts. (Dockery Decl. ¶ 12.) Instead of complying with Defendant Dockery's directions, Plaintiff sought to "appeal" her decision by emailing Conrad Mallett, the president and chief executive officer of Defendant DMC's Sinai-Grace Hospital. (Dockery Decl. ¶ 13, Tab 2, Sept. 6, 2009 Email.)

Conrad Mallett asked Defendant Dockery to handle Plaintiff's shirt sale issue. (*Id.*) Defendant Dockery explained to Plaintiff that his shirts could not be used by hospital staff because (1) the design used the old English letter "D" in the word Detroit, similar to the Detroit Tiger's logo, without permission from the Detroit Tigers; (2) the design advertised Sinai-Grace Hospital as a "trauma center," which is an inaccurate characterization of the hospital; and (3) the design incorporated the American flag. (Dockery Decl. ¶ 14, Tab 4, Sept. 23, 2009 Email.) Plaintiff again "appealed" Defendant Dockery's decision by emailing Conrad Mallet, who again delegated Defendant Dockery to address Plaintiff's concerns. (Dockery Decl. ¶ 15, Tab 3, Sept. 17, 2009 Email.)

Defendant Dockery and her assistant, Susan Roginski, met with Plaintiff on September 23, 2009, to address Plaintiff's continued attempts to sell shirts with his design to Sinai-Grace Hospital employees. During the meeting, Plaintiff began talking over Defendant Dockery by reading from the DMC dress code policy. (Dockery Decl. ¶ 17.) Plaintiff does not dispute that he refused to listen to Defendant Dockery or otherwise cooperate with her during the September 23, 2009 meeting:

> Q So you come into the room and Ms. Dockery indicates that your wearing of the shirt is contrary to her directives?
> A Something to that effect, yes.
> Q Then you take the policy out of your pocket and start reading it to her?
> A Correct.
> Q And then what happened?
> A She started raising her voice and telling me to shut up and -- it is really hard for me to recall what she was saying while I was reading something because I was focused on reading something and I am hearing the sound of my own voice, and she continued talking about something, but I figured, since Ms. Roginski was there taking notes on our statements, that I should finish what I am saying so my position is on the record that apparently she wants Sue Roginski to take notes on.
> Q So approximately how long did you continue reading the dress code policy?
> A I guess just several seconds, until I finished that paragraph.
> Q That is the paragraph that talks about the department manager?
> A I believe so, the director, the director's authority to dictate department dress code.
> Q And you read that policy after you had sent two Emails to Mr. Mallett on the subject, correct?
> A I believe that's correct, yeah.

(Jun. 25, 2011 Malouf Dep. 75-76.)

After Plaintiff's interaction with Defendant Dockery during the September 23, 2009 meeting, Defendant Dockery suspended Plaintiff's employment. (Dockery Decl. ¶ 18; Jun. 25, 2011 Malouf

7

Dep. 76.) Defendant Dockery then notified Laurie Shepard, a human resources employee for Defendant DMC, that Plaintiff had been suspended: "He would not let me talk; he was very rude and continued to talk over me. Because of his insubordination and, frankly his behavior was bizarre and his body language became quite threatening, I had to stop the meeting and told him we would have to continue this meeting in HR." (Dockery Decl., Tab 4, Sept. 23, 2009 Email.) Defendant Dockery further wrote: "It is my recommendation that this is a major infraction and should be addressed accordingly." (*Id*.)

Laurie Shepard investigated the incident and concluded that Plaintiff had violated the DMC progressive discipline policy. In a memorandum issued on September 25, 2009, Laurie Shepard concluded:

> Insubordination or refusal to carry out instructions of a supervisor or other member of management is a major infraction of the DMC's Progressive Discipline Policy. The investigation concludes that Mr. Malouf refused to carry out an instruction of a member of management. The investigation also concluded that Mr. Malouf's behavior during a meeting with management was unprofessional; also a major infraction of the DMC's Progressive Discipline Policy. Ms. Dockery's recommendation to terminate Mr. Malouf is supported by his Emergency Department Leadership.

(Dockery Decl., Tab 5, Sept. 25, 2009 Memorandum.)

Plaintiff now alleges that his employment was terminated as retaliation for his filing of sexual harassment complaints in May and June of 2008.

## II. STANDARD OF REVIEW

Where a party has objected to portions of a Magistrate Judge's Report and Recommendation, the Court conducts a *de novo* review of those portions. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)

(providing for "a de novo determination of those portions of the report or specific proposed findings or recommendations to which objection is made.").

The parties have filed cross motions for summary judgment in this matter. "Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving parties are entitled to judgment as a matter of law." *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012). In evaluating a motion for summary judgment, the Court must view "[a]ll facts, including inferences, . . . in the light most favorable to the nonmoving party." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). "The moving party has the burden of proving the absence of a genuine issue of material fact and its entitlement to summary judgment as a matter of law." *Id*. Ultimately, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter or law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### III. ANALYSIS

### A. Plaintiff's Objections to the Magistrate Judge's September 19, 2011 Discovery Order

On September 19, 2011, the Magistrate Judge entered an order denying Plaintiff's motion to extend the discovery deadline. (Dkt. No. 77.) In the instant Objection to the Magistrate Judge's R&R, Plaintiff asserts that he was diligent in attempting to contact Defendants before the closing of discovery to meet the discovery deadline, and that Defendants obstructed his attempts to depose certain individuals. (Pl.'s Obj. 2.) Plaintiff contends that "the Court committed irreversible error because you cannot restore witnesses [sic] faded memories of the events of 2009." (Pl.'s Obj. 3.)

Federal Rule of Civil Procedure 72(a) provides that "[a] party may serve and file objections to [a nondispositive] order within 14 days after being served with a copy. A party may not assign

as error a defect in the order not timely objected to." Fed. R. Civ. P. 72(a). Plaintiff filed the instant Objection to the Magistrate Judge's R&R on August 21, 2012, more than 11 months after the Magistrate Judge's order denying Plaintiff's motion to extend the discovery deadline. Accordingly, to the extent Plaintiff raises any objections to the Magistrate Judge's September 19, 2011 order, the Court will deny those objections as untimely.

## B. The Motions for Summary Judgment

Plaintiff concedes that he has no direct evidence showing that Defendants retaliated against him for engaging in protected activity. (Pl.'s Obj. 5.) Plaintiff's Title VII claim is therefore based on circumstantial evidence, and the Court must evaluate the claim under the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

The United States Court of Appeals for the Sixth Circuit has summarized the *McDonnell Douglas/Burdine* framework as follows:

> Absent direct evidence of discrimination, claims brought pursuant to Title VII's antidiscrimination provision . . . are subject to the tripartite burden-shifting framework first announced by the Supreme Court in [*McDonnell Douglas*], and subsequently modified in [*Burdine*]. . . . Under this framework, the plaintiff bears the initial "not onerous" burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff establishes this *prima facie* case, the burden shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. . . . Finally, if the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination.

*White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391-92 (6th Cir. 2008), *cert. denied*, 129 S.Ct. 2380 (2009) (citations omitted).

Plaintiff states that his Title VII claim is based solely on retaliation, not sexual harassment. (Pl.'s Obj. 6.) "Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). To establish a *prima facie* case of retaliation, Plaintiff must show that (1) he engaged in protected activity, (2) Defendants knew of Plaintiff's engagement in the protected activity, (3) Defendant took an adverse employment action against Plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. *Hamilton v. General Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009). The actual practices opposed by an employee need not be illegal for an actionable retaliation claim to arise; the plaintiff need only have "a reasonable and good faith belief that the opposed practices were unlawful." *Johnson*, 215 F.3d at 579 (citation omitted).

*1. Plaintiff Has Failed to Show That He Engaged in Protected Activity Under Title VII*

The Magistrate Judge reasoned that Plaintiff had failed to establish that he engaged in any protected activity.

> The evidence shows that in making the May 30, 2008 complaint to human resources, Plaintiff did not hold a good faith belief that Evans' actions amounted to a violation of Title VII. His acknowledged purpose in contacting human resources on May 30, 2008 was to procure a transfer to a day shift position, a request that was ultimately granted. . . . Further, given the fact that Plaintiff cannot support a claim of sexual harassment for the period between January and June, 2008, there is no basis for his claim that the May 30, 2008 human resource email was in fact a complaint of Title VII violations.

(R&R at 10-11.)

Plaintiff objects to this portion of the R&R. Plaintiff apparently concedes that his May 30, 2008 email to human resources does not constitute "protected activity." Plaintiff argues, however,

11

that his July 23, 2008 email to the EEOC constituted protected activity. Plaintiff also argues that Defendants had knowledge of his EEOC "complaint" because Plaintiff referred to "Deb Gordon's law firm and the EEOC investigators" in a July 30, 2008 email to the Emergency Department Manager, Bridget Berlin, which was subsequently forwarded to human resources employee Joi Little and Defendant Dockery. (Pl.'s Mtn. Summ. J., Ex. 5, July 30, 2008 Email.)

> The Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The one is known as the "opposition clause," the other as the "participation clause," . . . .

*Crawford v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009). Whether Plaintiff's activities fall under the participation clause or the opposition clause "is significant because federal courts have generally granted less protection for opposition then for participation in enforcement proceedings." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312 (6th Cir. 1989).

Plaintiff's July 30, 2008 email to Bridget Berlin does not constitute activity within the "opposition clause" of Title VII. While Plaintiff's email refers to a "sexual harassment complaint" and "EEOC investigators," it only alleges that particular employees, Ms. Farao and Ms. Evans, had a personal dislike for Plaintiff. The July 30, 2008 email does not contain any specific allegation that Defendants were engaging in an unlawful employment practice. *See Booker*, 879 F.2d at 1313 (holding "that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."). Furthermore, there is no evidence

that the EEOC initiated an investigation based on Plaintiff's July 23, 2008 email, and Plaintiff concedes that he did not pursue any of his complaints after he was transferred to the day shift in August 2008.

Plaintiff's July 23, 2008 email to the EEOC also does not constitute activity within the "participation clause" of Title VII. Plaintiff concedes that he did not file a formal charge with the EEOC until February 2010. (Jun. 25, 2008 Malouf Dep. 39.) Thus, there was no EEOC charge, investigation, proceeding, or hearing in which Plaintiff could have participated until February 2010. 42 U.S.C. § 2000e-3(a).

The Sixth Circuit has noted that "the instigation of proceedings leading to the filing of a complaint or a charge, including 'a visit to a government agency to inquire about filing a charge,' . . . is a prerequisite to protection under the participation clause." *Booker*, 879 F.2d at 1313 (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 200 (6th Cir. 1986)). However, Plaintiff's July 23, 2008 email to the EEOC only sought to "get [Plaintiff] transferred away from Ms. Evans and Farao and fine the hospital for this harassment." (Pl.'s Mot. Summ. J., Ex. 8, July 23, 2008 Email.) Likewise, Plaintiff's July 30, 2008 email requested that Plaintiff be moved to a day shift position. Plaintiff admitted at his deposition that after he was transferred to the day shift, he did not pursue the allegations in the July 2008 emails. (June 25, 2008 Malouf Dep. 39-40.) The evidence therefore reflects that Plaintiff's purpose for writing the emails was to be transferred to a day shift position, not to request that Defendants cease any allegedly unlawful employment practice. Accordingly, Plaintiff has failed to produce sufficient evidence showing that he engaged in any protected activity in July 2008.

*2. Plaintiff Has Failed to Show a Causal Connection Between His Discharge and Any Alleged Protected Activity*

An adverse employment action that occurs very close in time to the employer's learning about protected activity can "constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). However, "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id*.

The Magistrate Judge reasoned that Plaintiff had failed to establish a causal connection between his alleged sexual harassment complaint and his discharge.

> Moreover, Plaintiff's inability to establish a causal connection between the alleged protected activity and the adverse action defeats his claim. Contrary to his allegation that his May 30, 2008 complaint and followup complaint in July, 2008 precipitated adverse actions, these communications in fact resulted in his requested transfer to the desired day shift position in August, 2008. As a result of the complaints, the workplace change by all accounts was positive rather than adverse. Apparently, the Plaintiff cannot take "yes" for an answer.
> Further, Plaintiff makes no allegations of adverse actions anytime between the first week of August, 2008 and Spring, 2009. No reasonable trier of fact could conclude that as a result of the complaints, Defendants granted the desired transfer request, but "laid in wait" until the spring of 2009 to commence the retaliatory activity.
> . . .

(R&R at 12.)

Plaintiff objects to this portion of the R&R, arguing that there was "a mosaic of conduct" between June 2008 and September 2009 that the Magistrate Judge failed to consider. (Pl.'s Obj. 9.) However, Plaintiff's Objections, like his Motion for Summary Judgment, do not indicate any adverse employment actions that occurred between August 2008 and Spring 2009.

Plaintiff alleges that he received numerous writeups from his supervisor, Stephany Gaston,

in the spring of 2009. Increased scrutiny over a period of time after an employee files an EEOC complaint can establish sufficient causal connection between the protected activity and the adverse action. *See Hamilton*, 556 F.3d at 435-36 (finding that "[t]he combination of . . . increased scrutiny with the temporal proximity of [the plaintiff's] termination occurring less than three months after his EEOC filing is sufficient to establish the causal nexus needed to establish a prima facie case."). However, Plaintiff provides no evidence to bridge the gap between August 2008 and the alleged increased scrutiny beginning in the spring of 2009. This several-month gap is fatal to the causal connection element of Plaintiff's *prima facie* case. *See Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 718 (6th Cir. 2007) (finding that the plaintiff could not establish the causal connection element of a *prima facie* case for retaliation where there was a six-month gap between the plaintiff's discrimination claim filing and the adverse employment action, and the plaintiff "failed to provide sufficient additional evidence of retaliatory conduct . . . .").

*3. Plaintiff Has Failed to Meet His Burden of Showing That Defendants' Proffered Legitimate, Non-discriminatory Reason for His Discharge was Pretextual*

The Magistrate Judge found that, even if Plaintiff could establish a *prima facie* case of retaliation, Defendants had established a legitimate, non-discriminatory reason for his discharge: "even assuming that Plaintiff could establish a prima facie case of retaliation, affidavits by Dockery and her administrative assistant stating that Plaintiff was loud, aggressive, and threatening at the September 23, 2009 meeting establish that Plaintiff was terminated for legitimate, non-pretextual reasons unrelated to the May and July, 2009 'protected' conduct." (R&R at 13.)

Plaintiff argues that the Magistrate Judge erred because Defendants lied in their affidavits. (Pl.'s Obj. 16.) But Plaintiff admits that he refused to follow Defendant Dockery's directive that he not wear the t-shirts that he designed. (June 25, 2011 Malouf Dep. 75-76.) Plaintiff also

15

admitted that he attended a meeting with Defendant Dockery on September 23, 2009, and that he would not listen to Defendant Dockery during this meeting, interrupted her, and tried to talk over her. (*Id.*)

Under the *McDonnell Douglas/Burdine* burden-shifting framework, once the defendant employer has established a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts to the plaintiff employee to show that the proffered reason is a mere pretext, and not the real reason for the employer's actions. In the instant matter, Defendants have established that Plaintiff's insubordinate conduct during the September 23, 2009 meeting with Defendant Dockery constitutes a legitimate, non-discriminatory reason for his discharge. Plaintiff must therefore carry the burden of showing that the Defendants' proffered reason is a mere pretext.

Plaintiff contends that he had approval to distribute his t-shirts, and that Defendants' "'t-shirt defense' [is] nothing more than smoke and mirrors to draw attention away from the fact that the Plaintiff was fired for engaging in a protected activity." (Pl.'s Obj. 17.) However, Plaintiff's own emails to the Sinai-Grace Hospital president and chief executive officer, Conrad Mallett, undermine his argument. Plaintiff twice sent Mr. Mallett an email seeking approval to distribute his shirts to Sinai-Grace Hospital employees. (Pl.'s Mtn. Summ. J., Ex. 4, Sept. 4, 2009, and Sept. 17, 2009 Emails.) Mr. Mallett referred both of Plaintiff's emails to Defendant Dockery, asking her to handle Plaintiff's request. (*Id.*) Accordingly, it is clear that there was a dispute between Plaintiff and Defendant Dockery regarding his distributing shirts he designed for Sinai-Grace Hospital employees without Defendant Dockery's approval. It is also clear that this dispute culminated in the September 23, 2009 meeting between Plaintiff and Defendant Dockery, during which Plaintiff admitted he talked over Defendant Dockery and refused to listen to her. Plaintiff's unprofessional behavior

during the September 23, 2009 meeting led to his discharge. Plaintiff has thus failed to carry his burden of showing that Defendants' proffered non-discriminatory reason for his discharge is pretextual.

In sum, the Court agrees with the Magistrate Judge's analysis in the R&R, and further finds that Plaintiff has failed to establish the necessary elements of a *prima facie* case of retaliation, and has failed to demonstrate that Defendants' proffered non-discriminatory reason for his discharge is pretextual.

## IV.  CONCLUSION

For the reasons stated above, the Court will:

(1) **ADOPT** the Magistrate Judge's Report and Recommendation;

(2) **GRANT** Defendants' Motion for Summary Judgment; and

(3) **DENY** Plaintiff's Motion for Summary Judgment.

**SO ORDERED.**


        S/Paul D. Borman  
        PAUL D. BORMAN  
        UNITED STATES DISTRICT JUDGE

Dated:  January 25, 2013

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 25, 2013.

        S/Denise Goodine  
        Case Manager